

## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-16-00390-CR

JAIME MARTINEZ JR.                                        APPELLANT

V.

THE STATE OF TEXAS                                            STATE

----------

### FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY
### TRIAL COURT NO. 1422908D

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Before Christmas in 2010, M.L.'s mother Nancy[2] met Appellant Jaime

Martinez Jr. After dating for a couple of weeks, Martinez and three of his children

----

[1]*See* Tex. R. App. P. 47.4.

[2]We refer to the child victim and the child's family members by initials or pseudonyms to protect the child's privacy. *See* Tex. R. App. P. 9.10(a)(3).

moved in with Nancy. Martinez took care of all of his and Nancy's children while Nancy worked the graveyard shift. By May 2011, Martinez and his children had moved out.

Four years later, M.L. began acting out sexually, which led to an investigation by Child Protective Services (CPS) in May 2015 and by the police in June 2015, to Martinez's indictment in August 2015,[3] and to his jury trial and conviction in September 2016 for continuous sexual abuse of a child under fourteen years of age. The jury assessed Martinez's punishment at sixty years' confinement, the trial court entered judgment on the verdict, and in two points, Martinez appeals his conviction for continuous sexual abuse of a child under fourteen years of age, complaining that the evidence is insufficient to support his conviction and that the trial court abused its discretion in the admission of evidence. We affirm.

## II. Sufficiency

In his first point, Martinez complains that the evidence is insufficient to sustain his conviction, arguing that M.L.'s testimony failed to provide sufficient

---

[3]The State alleged in the first count of the four-count indictment that Martinez had on or about August 30, 2010, through August 5, 2011, intentionally or knowingly, during a period of time that is 30 days or more in duration, committed two or more acts of sexual abuse—aggravated sexual assault of a child under the age of fourteen by causing M.L.'s sexual organ to contact his sexual organ and/or by penetrating M.L.'s sexual organ with his finger, and indecency with a child by touching M.L.'s genitals with the intent to arouse or gratify his sexual desire. *See* Tex. Penal Code Ann. § 21.02(b), (c)(2), (4) (West Supp. 2017).

2

proof because her testimony was ambiguous and lacked any credibility. He also contends that there is no evidence to support the jury's finding that the events occurred during a time period of 30 days or more in duration. In his second point, Martinez argues that the trial court abused its discretion by allowing Dr. Sophia Grant to testify by reading from a record that had not been admitted for all purposes.

## A. Standard of Review and Applicable Law

In our due process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we

3

determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

4

The jury found Martinez guilty of the offense of continuous sexual abuse of a child, found in penal code section 21.02. Penal code section 21.02 provides that a person commits an offense if during a period that is 30 or more days in duration, he commits two or more acts of sexual abuse, regardless of whether the acts are committed against one or more victims, and at the time of the commission of the acts of sexual abuse, the actor is seventeen years of age or older and the victim is a child younger than fourteen years of age. Tex. Penal Code Ann. § 21.02(b). The statute lists eight different acts that constitute an act of "sexual abuse," including aggravated sexual assault and indecency with a child when committed in a manner other than by touching the breast of a child. *Id.* § 21.02(c)(1)–(8). The State alleged acts including both aggravated sexual assault of a child and indecency with a child. Accordingly, as authorized by the indictment, to convict Martinez, the jury had to find that during a time period of 30 days or more between August 30, 2010 and August 5, 2011, Martinez committed two or more acts of sexual abuse by committing aggravated sexual assault of a child by causing M.L.'s sexual organ to contact his sexual organ or by his digitally penetrating M.L.'s sexual organ and indecency by touching M.L.'s genitals with the intent to arouse or gratify his sexual desire. *See id.* § 21.02(c)(2), (4).

## B. Evidence

### 1. Nancy's Testimony

M.L., who was ten years old at the time of the trial, was the youngest of thirty-three-year-old Nancy's three children and shared the same father as Barry,

5

Nancy's middle child. In 2010, M.L. was four years old,[4] Barry was five years old, and Nancy's oldest child, Amelia, was seven years old. Amelia lived with her father but stayed with Nancy on the weekends. Amelia moved in with Nancy three years later.

Nancy met Martinez in December 2010, and in January 2011, he and three of his four kids—two girls and a boy, who were around the same ages as Nancy's children—moved into the apartment in Saginaw where she, M.L., Barry, and Nancy's friend Cindy lived. In February or March, they moved into a one-bedroom apartment in Fort Worth; Martinez's other son moved in with them in the Fort Worth apartment. The six children slept in the bedroom, and Nancy and Martinez slept in the living room. Nancy agreed that if something went on in the living room, it could be heard in the bedroom, and vice versa. The children usually stayed in the bedroom because that was where their toys and the television were.

Nancy and Martinez both worked at Jack in the Box when their relationship began. Nancy was a shift leader and had worked there for about six years by the time of the trial. She always worked the graveyard shift—10:00 p.m. to 6 a.m.—and Martinez, who was in his twenties at the time, took care of the children while she was working because he lost his job not long after they started dating and

---

[4]M.L. turned five years old in August 2011.

6

before they moved to Fort Worth. They broke up in May 2011, and Martinez and his children moved out.

After Martinez and Nancy broke up, they stayed in touch on-and-off through texts and Facebook. While Nancy tried "to mend things" because she had wanted to get back together with him, Martinez started dating one of her friends. Nancy found out about this three years later, in 2014, which was the last time that she had any communication with him.

In May 2015, Nancy lived with Camelia, a friend with whom she had worked at Jack in the Box, and Camelia's four children, who were younger than Nancy's children. CPS investigated their home after Camelia reported that M.L. had tried to touch and kiss Camelia's son Ned. Sometime after Nancy talked with the CPS investigator, M.L. made an outcry to Tammy. Nancy had been friends with Tammy since 2008 but was no longer friends with her by the time of the trial. At one point, Tammy's mother had wanted to adopt Nancy's children.

After M.L. made her outcry to Tammy, Nancy talked with the CPS investigator and a Fort Worth police detective about M.L.'s sexual abuse allegations against Martinez. Nancy took M.L. to Alliance for Children[5] for an interview and to Cook Children's Hospital for an examination.

---

[5]Alliance for Children is Tarrant County's children's advocacy center, whose mission is to bring together law enforcement, CPS, forensic interviewing, counseling, childcare licensing, and other services to provide a team approach in addressing and investigating child abuse allegations.

7

Nancy was shocked by M.L.'s allegations and did not believe them at first. She thought that M.L.'s father must have made up the allegations because it did not make sense to her that M.L. would tell Tammy instead of her mother. She also did not believe something like that would happen to her child. By the time of trial, she believed her daughter, testifying that "every kid has little fibs, but she would not fib about something so big." M.L. had been in therapy since January 2016 and attended therapy every Tuesday.

Although Nancy identified Martinez in the courtroom, she said that his appearance had changed since they had lived together in 2011. According to Nancy, Martinez had gained weight, was no longer bald, and was now wearing glasses, which he did not wear when he lived with her. When Martinez lived with her in 2011, he was M.L.'s sole caretaker when Nancy was not there; before him, her friend Tina was M.L.'s caretaker. M.L. had not been in school at the time, and they did not attend church on a regular basis. Between May 2011, when Nancy and Martinez broke up, and the time of trial, Nancy had had no serious relationships or live-in adult males.

### 2. M.L.'s Testimony

Before ten-year-old M.L. testified, the trial court assessed her competency. M.L. stated that she understood that it was important to be honest and that she knew the difference between the truth and a lie, explaining, "A lie is where something is fake and a real [sic] is something that you tell the truth about." After

she promised the trial court that all of her answers would be the truth, the trial court swore her in.

M.L. did not recognize Martinez at trial but recalled living in the one-bedroom apartment with him, his children, her siblings, and her mother. She recalled that her mother had left the children with him when she worked at night at Jack in the Box.

M.L. testified that when her mother was at work, Martinez would take off her clothes and his clothes and blindfold her. Then he "got on top of [her] and went up and down on [her]" and removed the blindfold when he was done. Although M.L. did not see Martinez's "private,"[6] she described Martinez's touching her private with his private. M.L. did not recall smelling or hearing anything and said that it felt "like somebody was trying to throw a rock at [her]." M.L. denied that he had touched her private with anything else and said that she never told him that it hurt and did not cry when he did it.

M.L. said that this happened "[a] lot" and that it always happened in the living room on the couch, "one of the long ones." She did not know how many times that it happened but the last time it happened was when she was almost five years old; Martinez moved out when she was about to turn five, and he stopped the abuse before he moved.

---

[6]M.L. defined a "private" as what one used "[t]o pee."

9

M.L. said that she did not recall Martinez carrying her from her bed to the couch but that she thought he carried her. She did not know what was happening when she woke up but said that when he would "[g]o up and down on [her]," it felt "gross" and that it hurt on her "private." M.L. said that the other children were in the bedroom and that none of them were awake when it happened. She did not tell anyone about what was happening because Martinez told her that if she told anyone, he would hurt or kill her, and she believed him. After Martinez moved out, she never saw him again.

M.L. was eight years old when she told her sister about the abuse. M.L. initially said that she thought the first adult she had told was her mother but then said that she did not tell her mother at first because she was nervous. She recalled telling Tammy and someone from CPS when they lived with Camelia. Tammy told her that Martinez must have done something to her, and then M.L. told her what had happened.[7] But M.L. said that Tammy did not tell M.L. to say anything about Martinez or tell her that M.L. needed to tell her that Martinez did something to her. M.L. said that she thought her mother had asked her whether Martinez did anything to her around the same time that she talked with Tammy. M.L. testified that no one had ever told her to make up a story about Martinez or say anything untrue about him and that everything she had testified about was the truth.

---

[7]When asked what she told Tammy, M.L. replied, "The same thing I'm telling y'all."

10

M.L. remembered talking with a woman about what happened at Alliance for Children and going to Cook Children's Hospital for the exam when the nurse checked her body to see if she was okay.

### 3. CPS Investigator's Testimony

CPS Investigator Kathryn Rosenbaum, who had a bachelor's degree in psychology and sociology, had worked for CPS for two-and-a-half years as an investigator at the time of the trial. On May 14, 2015, she received an intake assignment with regard to M.L., who had been acting out sexually in an age-inappropriate way. Camelia had called in the investigation.

Rosenbaum said that during an investigation, a CPS investigator would interview all of the children in the home and their caretakers and anyone against whom an allegation was made, in addition to calling the police to see if there had been any reports, calling pediatricians, friends, neighbors, and teachers to see if they had any concerns, and reviewing any CPS history. As part of her May 2015 investigation, she looked at CPS's January 2015 investigation during which M.L. had been given the opportunity to say whether someone had been sexually inappropriate with her. At that time, M.L. had denied that anyone had been sexually inappropriate with her.

After speaking with M.L., Rosenbaum made a referral for her to have a forensic interview. Based on M.L.'s age and her actions, CPS wanted to find out where she learned the behaviors that were outside of what an average ordinary child that age would know. Rosenbaum said that based on M.L.'s actions, she

thought it was possible that M.L. had been sexually abused and that after investigating, CPS found "reason to believe." Rosenbaum explained that a forensic interview took place with an interviewer who was specifically trained to talk to children about severe physical abuse or sexual abuse in a nonleading way and that the interview was recorded so that the child did not have to be asked for her story over and over again.[8]

### 4. Forensic Investigator's Testimony

Lindsay Dula, Alliance for Children's director of program services, testified that she had worked there since 2007 as a dedicated forensic interviewer. She performed the forensic interview on M.L. on June 10, 2015, when M.L. was eight years old.

Dula, who had a bachelor's degree in social work and psychology and a master's of social work, explained that there was a nationally recognized protocol developed for forensic interviews. She had trained others to conduct forensic interviews and explained that it was necessary to understand child development in order to understand at what level a child communicates because a child's ability to understand and encode memories is different at different ages. With regard to a child's comprehension of sex acts, Dula said that this was affected by

---

[8]Other witnesses described a forensic interview as an investigative-based interview requiring specialized training in which the interviewer meets with the child, identifies how far along developmentally the child is, and allows the child to lead the interview in a non-suggestive manner that gives the child the opportunity to report anything he or she would like to report.

the child's age because—particularly with smaller children—the child might not understand the different parts of his or her body or that the contact is sexual in nature, stating, "[T]hey don't like it, but they may not even understand really the scope of what's happening," and that affects the child's ability to articulate what has happened. Depending on the child's age, he or she may not know to report it to someone; Dula elaborated, "It's just something that is happening and they don't like it, but they don't even know they're supposed to tell."

A child's age can also affect whether the child can interpret and understand a threat. Dula explained,

> I -- I think in my experience when talking to children who have expressed that they've been threatened, most often in my experience they have been threatened to keep quiet or don't say anything. And I think for a lot of the kids that I talk to it's almost regardless of age, if they are threatened not to say anything, they frequently don't say something. I think it is more prevalent with smaller children that they take that stronger to heart.
>
> And sometimes the threats can be direct. It can be a statement that is made directly to the child. Or it may be behavior that is seen; for instance, behavior in a household, maybe how the perpetrator or the alleged perpetrator acts if they are -- get angry or if they maybe are violent with somebody else, then that kind of reinforces if they were told, ["D]on't tell.["]

Dula said that it was common to have a delayed disclosure of child abuse and that the vast majority of the time when a child is sexually abused, that child is abused by somebody he or she knows and trusts. She stated, "[O]ver 90 percent of the time it's somebody that they already have a relationship with, whether it's family, whether it's friends of family, whether it's somebody else significant in

13

their life, a teacher, another caregiver." Dula testified that statistically, one in ten kids is sexually abused before age eighteen[9] and while not all children who are sexually abused will act out sexually, acting out sexually seems to occur in children who have experienced sexual abuse at a younger age and who do not understand what happened or how it affects other relationships. She acknowledged on cross-examination that it depended on the child and the circumstances, including what a child had seen on television or in the child's home.

Dula stated that when she did a forensic interview, it did not surprise her that a child might disclose sexual abuse and not be emotional about it because the child has "had to live with this experience" while being constantly directed on what to do on a daily basis. "They don't get to just kind of go into this comatose state that seems normal, I think, for a lot of grownups." Instead, children cope the best way that they can.

Dula explained the distinction between script memory and episodic memory, stating that script memory was when one told the story because "that's what you do every time," while episodic memory was something that was different and distinct and encodes, embeds, and stays in the memory differently.

---

[9]During cross-examination, Dula said that the 1-in-10 statistic was a nationally known statistic from an organization called Darkness to Light, which was in the business of child-sexual-abuse training. Dula said that she thought Darkness to Light had obtained that information from the National Institute of Child Health and Human Development (NICHD) or another governmental source.

This distinction between script and episodic memory affects a child's memory of continuous abuse:

> It's the idea that if I was abused the same way constantly over a period of time, that may be what happened. And then as an interviewer, I'm going to explore if there was anything different, if there was anything that stood out. And so it's going to be those details that -- that kind of delineate some of the different acts that may take place when a child is chronically sexually abused.

Dula stated that one of the items she looked for in a forensic interview was signs of coaching. If a child reported something, the child might be asked if someone told the child that or told the child to say that. During cross-examination, Dula agreed that if someone told an eight- or nine-year-old child that it was okay to tell her that Martinez had abused her, that could be considered a suggestive or leading question. She likewise agreed that if someone said to the child, "I know [Martinez] abused you and you can tell me about it," this could, but not necessarily would, put the idea in the child's mind that she was abused.

Dula stated during cross-examination that during a forensic interview, the interviewer looks for sensory details—something the child might have heard, smelled, felt on his or her body, or seen—because those sensory and peripheral details help clarify what the child's experience was. Most often in her experience, when children are coached, their descriptions lack sensory-peripheral details. On redirect, Dula acknowledged that a child's describing the abuse's location as happening on a long couch was a kind of peripheral detail,

15

that a child's describing the perpetrator as using a blindfold was another, and that a child's describing the abuse as feeling like being hit with a rock was another significant detail. Dula also stated that it was not necessarily important for her job whether the child is truthful because she was just there to gather and clarify whatever statement the child wanted to make.

During her forensic interview, M.L. told Dula that she was four years old when the first instance of abuse happened, not long after they moved in with Martinez, and that the perpetrator had used his hand to touch the "hole of her private part" and used his private part to touch the "line of her private part." M.L. indicated that the perpetrator had moved his hand "in a kind of rubbing motion" and that she laid on the couch and he sat on her shins when he used his hand to touch her. Dula said that she did not see any indications of coaching during the interview. During recross-examination, Dula said that she did not think she had asked M.L. if she remembered smelling anything or if she had masturbated the perpetrator. When asked whether she would expect a child who masturbated someone to remember what it felt like, Dula replied, "I would."

Dula said that during an interview, a detective or CPS worker may watch the interview in the closed-circuit monitoring room. If the detective or CPS investigator has a point of clarification, they can turn on a light that shows up in the interview room to signal that they need to ask the interviewer to clarify something. During M.L.'s interview, Dula went out to talk to the detective

16

because he had indicated that he had a point of clarification. The investigators are the only people that can see the closed-circuit television.

### 5. Other Testimony

Fort Worth Police Detective William Adams testified that he had been a Fort Worth police officer for more than sixteen years and had been in the crimes-against-children unit for the last two-and-a-half years, investigating any case in which a child is a victim of physical or sexual abuse. He was assigned to M.L.'s case, which originated as a CPS referral, on June 2, 2015. Detective Adams observed Dula's forensic interview with M.L.

Dr. Sophia Grant, who was board-certified in both general pediatrics and child abuse pediatrics, testified that she was part of Cook Children's Hospital's CARE team, the unit assigned to examine children when child abuse or neglect has been alleged. The CARE team, which examines children up to age seventeen, was composed of two physicians, two nurse practitioners, three sexual assault nurse examiners, a medical assistant, an office manager, and two social workers. Dr. Grant testified that when the medical director was away, she supervised the nurse practitioners and signed off on their charts. Dr. Grant described the process of performing a sexual abuse examination as obtaining from a child's parents a medical history—including their understanding of why the child was being examined—and permission to perform an examination and then meeting with the child to establish rapport, identify what words the child used for his or her genitalia, and explain what would happen in the exam, followed by a

17

head-to-toe physical assessment that concluded with a genital exam. The child would be photographed, and blood and urine would be tested for sexually transmitted infections.

M.L. was examined on June 22, 2015. Dr. Grant stated that she did not perform the exam but signed off on it. During her testimony, Dr. Grant stated that M.L. had reported that while Nancy was at work Martinez had put her on the couch, took off his clothes and her clothes, and got on top of her and went up and down and told her not to tell or he would kill her. Dr. Grant said that M.L. denied any exposure to pornography or other abuse by anyone else and described pain when Martinez's penis and finger contacted her vagina and when his finger contacted her anus but described no bleeding. Dr. Grant stated that M.L. described fondling or masturbating Martinez's penis but did not describe ejaculation and that M.L. described his having fondled her buttocks. M.L. reported that it happened a lot at her house, started when she was four or five years old, and stopped when she was five years old. M.L.'s head-to-toe examination reflected that she had a first-degree sunburn and some cat scratches but her genital exam was normal. Dr. Grant opined that there would not have been a finding as to the child's genitalia because M.L. was almost nine years old at the time of the exam and the last exposure to abuse had been when she was five years old, so any injuries would have healed since then.

During cross-examination, Dr. Grant testified that she did not create the medical records and that Araceli Desmarais, a former sexual assault nurse

examiner at Cook Children's Hospital, had conducted the exam and created the records. Dr. Grant testified that Desmarais had resigned, in part, because after she had done some consulting work in an adult sexual assault case that had raised a conflict of interest, the Tarrant County District Attorney's Office would no longer sponsor her as a believable witness. On redirect, Dr. Grant described her review process before signing off on records, said that she followed her usual process, and stated that in M.L.'s case, upon her review of the records, there was nothing that concerned her. On recross, when asked whether the fact that the District Attorney's office would not call Desmarais to testify influenced anything that Dr. Grant saw in the records, Dr. Grant replied, "No, it doesn't."

## C. Analysis

Based on the evidence at trial, the jury could have found beyond a reasonable doubt that Martinez committed two or more acts of sexual abuse during a period that is 30 or more days in duration because the evidence shows that Martinez, who was older than age seventeen at the time, moved in with four-year-old M.L. and her family in January 2011, and he abused her "a lot," not stopping until just before he moved out in May 2011. Based on Nancy's testimony, M.L.'s testimony, and Dula's testimony, the jury could have found beyond a reasonable doubt that during that January-to-May 2011 time period, when Martinez lived with Nancy and her children and took care of them at night while Nancy was at work, Martinez frequently caused M.L.'s sexual organ to contact his sexual organ (touched her "private" to his "private" and used his

19

private to touch the "line of her private part") and either digitally penetrated her sexual organ or touched her genitals with the intent to arouse or gratify his sexual desire (used his hand to touch the "hole of her private part"). *See* Tex. Penal Code Ann. § 21.02(b), (c)(2), (4).

Although Martinez argues that M.L.'s testimony was ambiguous and lacked any credibility, the jury was entitled to believe or disbelieve any portion of the testimony—M.L.'s, her mother's, the forensic interviewer's, or any combination thereof, in addition to any and all of the evidence set out above. We cannot "sit as a thirteenth juror" and reweigh the evidence from our own perspective but rather must determine whether the jury, acting rationally, could have found the evidence sufficient to establish the elements beyond a reasonable doubt. *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990). Accordingly, we conclude that the evidence is sufficient to support his conviction, and we overrule his first point.

### III. Hearsay

In his second point, Martinez argues that the trial court erred by permitting Dr. Grant to testify "by reading from a record that had not been admitted for all purposes." To support his argument, he cites *Wheatfall v. State*, 882 S.W.2d 829, 837 (Tex. Crim. App. 1994), *cert. denied*, 513 U.S. 1086 (1995),[10] and

_____

[10]In *Wheatfall*, the appellant argued that he was denied due process when the *prosecutor* summarized the contents of various documents that had been admitted into evidence, which, in the appellant's view, converted the prosecutor into a testifying witness. 882 S.W.2d at 837. The court observed that common

20

*Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.—San Antonio 2009, pet. ref'd),[11] for the proposition that a document must be properly admitted into evidence before a witness may read from its contents. In his argument, Martinez ignores both that he never raised a hearsay objection in the trial court and that the portion of the medical record read by Dr. Grant during her testimony would have been admissible under a hearsay exception and accordingly subject to publication by reading or other method of disclosure to the jury. *See* Tex. R. Evid. 803(4) ("Statement Made for Medical Diagnosis or Treatment"); *Berkley*, 298 S.W.3d at 715 ("Because there was evidence before the court that the purpose of the record was to render medical treatment to the complainant, and

practice in state and federal court appeared to be that "when a document is admitted into evidence, counsel or a witness can read the document aloud to the jury." *Id.* at 837–38 (footnotes omitted) (discussing the methods of "publishing" written documents to the jury and concluding that the trial court did not abuse its discretion by permitting the prosecutor to read portions of the admitted exhibits into evidence). In contrast, in the instant case, a medical witness—not the prosecutor—read from a medical report that had not been admitted into evidence but that could have been admitted into evidence under the medical records exception to the hearsay rule.

[11]In *Berkley*, the appellant complained that his Confrontation Clause rights were violated when the trial court admitted into evidence a medical report prepared by a sexual assault nurse examiner who did not appear as a witness and allowed a different sexual assault nurse examiner to testify about the report. 298 S.W.3d at 714. The court cited *Wheatfall* for the proposition that if a document is properly admitted into evidence—i.e., is not improperly admitted over a Confrontation Clause objection—then a witness may read the contents of that document to the jury. *Id.* at 715. Martinez did not raise a Confrontation Clause objection at trial. *See id.* (holding that the trial court did not err by admitting the nurse's report into evidence when medical records created for treatment purposes are not "testimonial" under *Crawford v. Washington*, 541 U.S. 36 (2004)).

21

this evidence went unchallenged, we hold the trial court did not err in admitting the nurse's report of the examination."). Although in the body of his argument on appeal, Martinez complains that he was harmed by improper bolstering, because the medical report would have been properly admitted into evidence and then published, we conclude that the trial court did not abuse its discretion by the skipping of a step on the path to the same result.[12] We overrule Martinez's second point.

---

[12]That is, if Martinez had raised a hearsay objection, the trial court would have properly overruled it, and the information still would have been properly presented to the jury. Additionally, Martinez did not request a running objection to Dr. Grant's allegedly inadmissible testimony, *see Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003), and all but Dr. Grant's brief testimony about M.L.'s description of pain, fondling, and masturbation—which would have been admissible under code of criminal procedure article 38.37 to the extent it described extraneous offenses, to which Martinez also did not object—paralleled unobjected-to evidence that came in through other witnesses during the trial. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."); *see also* Tex. Code Crim. Proc. Ann. art. 38.37 (West Supp. 2017); *Sanders v. State*, 255 S.W.3d 754, 760 (Tex. App.—Fort Worth 2008, pet. ref'd). And there is no indication on this record, when reviewed as a whole, that Dr. Grant's testimony had a substantial or injurious effect or influence in determining the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).

## IV. Conclusion

Having overruled both of Martinez's points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL:  SUDDERTH, C.J.; KERR and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  March 8, 2018